STATE OF CONNECTICUT *v.* PAUL KENNEDY
(7012)

DALY, O'CONNELL and FOTI, Js.

Argued October 6—decision released December 19, 1989

*Laura P. Gordon* and *Dana E. Shaw,* certified legal interns, with whom were *Michael R. Sheldon* and, on the brief, *Timothy H. Everett* and *Todd D. Fernow,* and *Karen D. Steinberg, Pamela J. Bristol* and *Claudia Baio,* certified legal interns, for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *C. Robert Satti, Sr.,* state's attorney, and *Irving Aronson,* former assistant state's attorney, for the appellee (state).

DALY, J. The defendant appeals from the judgment of conviction, after a jury trial, of larceny in the first degree in violation of General Statutes § 53a-122 (a) (2).[1] The defendant claims that the court erred (1) in denying his two amended motions to suppress, (2) in admitting the testimony of an incompetent witness regarding the value of the items allegedly stolen, and (3) in denying his motion for judgment of acquittal. We find no reversible error.

The following facts are relevant to our resolution of this appeal. On Friday, September 27, 1985, during or shortly after Hurricane Gloria, a break-in occurred at the Slater Museum located on the grounds of the Norwich Free Academy in Norwich. A large wooden display case that housed a set of Japanese and Korean pottery and ivory carvings known as Netsukes (Netsuke collection) was ransacked. Mary-Anne Hall, the museum's docent,[2] and two assistants compiled a complete list of the missing items from inventory cards and gave the list to the Norwich police. Included in this information was a valuation of each item that was based on a 1979 appraisal made by Betty Killam Leavitt, a recognized authority on Netsukes hired by the museum.

On October 8, 1986, the Norwich police obtained a search warrant for 57 Freeman Avenue, Norwich, to

[1] General Statutes § 53a-122 provides in relevant part: "(a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or services exceeds ten thousand dollars . . . ."

[2] A docent is "a person who conducts guided groups through a museum or art gallery and discusses and comments on the exhibits." Webster, Third New International Dictionary. At trial, Hall described her particular role as a person who teaches about the museum's collections.

search the premises for the defendant. That warrant was based on information provided by the Waterford police department that the defendant was wanted for larceny in the fourth degree, criminal trespass in the first degree and failure to appear in the second degree, crimes unrelated to the museum break-in. Four members of the Norwich police department proceeded to the premises to execute the warrant. Sergeant Robert Bernes was in charge of the search. Officers Kenneth Simoneau, Raymond Perry and Warren Mocek assisted him. Bernes and Simoneau comprised one team and Perry and Mocek comprised a second team; only Bernes and Perry were equipped with radios. When they arrived on the premises, the two teams divided and Bernes and Simoneau entered the one-story house through the front door, while Perry and Mocek entered through the garage located on the lower level.

After several unsuccessful attempts to inform the owner of their presence, Bernes and Simoneau forcibly opened the front door. Once inside, Bernes informed the owner, Pasquale Tamborra, the defendant's bedridden grandfather, of the purpose of their intrusion. Bernes then remained on the first floor while Simoneau went to the attic to search for the defendant.

Meanwhile, Perry and Mocek entered the house through the lower level basement garage, smashing locks to gain entrance. While searching for the defendant, Perry uncovered a tarpaulin that was bulging and large enough to conceal a man, and observed contraband, money, and an opened nylon gym bag containing two antique pottery bowls and some other artifacts. Perry also saw a label on the pottery that said "Chinese Han Dynasty." Perry seized the gym bag and notified Bernes of this discovery by radio. Five to ten minutes after Perry had informed Bernes of his discovery, Perry received a call from Bernes who told him that the defendant had been apprehended and the

search ended. The defendant was found in the attic by Simoneau, who sought and received Bernes' help in apprehending and securing the defendant because the opening to the attic was small and the situation was potentially dangerous. After the defendant was taken into custody, Perry brought the gym bag upstairs. Mocek remained at the house to secure the residence.

At least one of the bowls inside the gym bag was later identified by the museum as part of the missing Netsuke collection. The officers obtained a second search warrant that afternoon to search the premises for the remaining artifacts missing from the museum's Netsuke collection. The officers executed the second warrant the same day and recovered additional artifacts from the missing Netsuke collection in the basement garage. The police subsequently obtained an arrest warrant and arrested the defendant for his participation in the Slater Museum theft.

The defendant filed a motion to suppress the evidence seized during the first search, claiming that it was unconstitutionally seized. The defendant made a separate motion on similar grounds to suppress the museum artifacts seized during the second search. The court denied these motions after determining that the defendant lacked standing to challenge the seizures.

Soon after jury selection began, the defendant filed amended motions to suppress the fruits of the October 8, 1986 searches of and seizures from his residence after he obtained additional evidence to show that he had a reasonable expectation of privacy in the basement garage. The court denied the amended motions because it found that the defendant lacked standing. The court further found that even if the defendant had standing, the seizure of the original items was reasonable under the plain view doctrine. At the end of the state's case, the defendant also moved unsuccessfully

for a judgment of acquittal on the ground, inter alia, that the only evidence of value was uncorroborated hearsay. The defendant was convicted after a jury trial and appealed after the court denied his motion for a new trial.

## I

The defendant's first claim is that the trial court erred in denying his amended motions to suppress when it concluded that he did not have standing to raise the motion, and when it concluded that the original seizure was justified under the plain view doctrine. We find no reversible error.

## A

The defendant argues, and the state concedes, that the trial court erroneously found that the defendant lacked standing because he did not exercise "sole or exclusive control" over the searched premises. "The capacity to claim the protection of the fourth amendment does not depend upon a property interest, permanency of residence, or payment of rent but upon whether the person who claims fourth amendment protection has a reasonable expectation of privacy in the invaded area. . . . Further, the fact that a person does not have the exclusive use of an area does not bar his having a reasonable expectation of privacy that furnishes standing to object to a government search. *Mancusi* v. *DeForte,* 392 U.S. 364, 368, 88 S. Ct. 2120, 20 L. Ed. 2d 1154 (1968); *Garrison* v. *State,* 345 A.2d 86, 93 (Md. App. 1975)." (Citations omitted.) *State* v. *Reddick,* 207 Conn. 323, 330–31, 541 A.2d 1209 (1988). Id., 330–31. Thus, the court in the present case misapplied the law in determining that the defendant could not have had a reasonable expectation of privacy in the basement garage merely because he did not have sole and exclusive control of the basement garage.

This, however, does not end the inquiry. We must next determine whether the defendant proved that the search and seizure invaded his reasonable expectation of privacy. "Whether a reasonable expectation of privacy exists is a determination to be made on a case-by-case basis." Id., 331. "That determination entails a two-part inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and second, whether that expectation is one society recognizes as reasonable. *Katz* v. *United States,* [389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)]; *United States* v. *Cassity,* [720 F.2d 451, 456 (6th Cir. 1983), vacated and remanded, 468 U.S. 1212, 104 S. Ct. 3581, 82 L. Ed. 2d 879 (1984), rev'd on other grounds, 604 F. Sup. 1566 (E.D. Mich. 1985), aff'd, 807 F.2d 509 (6th Cir. 1986)]; *State* v. *Zindros,* [189 Conn. 228, 239, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984)]; *State* v. *Cooper,* 9 Conn. App. 15, 20, 514 A.2d 758 (1986)." Id.

After carefully reviewing the record, we conclude that the defendant has demonstrated that his subjective expectation of privacy in the basement garage of 57 Freeman Avenue was reasonable and was an expectation that society would also recognize as reasonable. In an analogous case, our Supreme Court in *State* v. *Reddick,* supra, 331, concluded that an adult son or daughter has a reasonable expectation of privacy in his or her parent's home when living temporarily or permanently with a parent in the parental home. The court further concluded that the defendant had a reasonable expectation of privacy in the the common basement of this two-family house. Id., 332. In the present case, the defendant also had a reasonable expectation of privacy in the basement garage since he is the grandson of the owner, who had lived at the searched residence for

more than one year, who had cared for his invalid grandfather, and who had made repairs around the house.

The Supreme Court in *Reddick* further concluded that the expectation of privacy in the common basement of the two-family house was an expectation that society would recognize as reasonable, where evidence was presented that the basement was secured from the outside and readily accessible only from the two apartments within the dwelling. See id., 333. In the present case, the defendant's expectation of privacy in the basement garage is also one that society would recognize as reasonable because he secured the basement garage from the outside and controlled access by way of a key.

Although we agree that the trial court erred in finding that the defendant did not have standing to challenge the search, this was not the sole basis of the court's ruling. The trial court also found that the search was reasonable under the plain view doctrine. We must next turn our attention to this basis for the trial court's decision.

## B

The defendant claims that the trial court erroneously found that the seizure of the original items was reasonable under the plain view doctrine. Specifically, the defendant claims that the trial court erroneously concluded that the state had proved that the seizing officer had the right to be present at the moment he first observed the items, and that there was probable cause to seize the items. We do not agree.

" ' " 'Where a police officer has a warrant to search a given area for specified objects, and in the course of the search comes across some other article of incriminating character, the property is seizable under the plain view doctrine.' . . ." ' The plain view doctrine

may be invoked to validate the seizure of contraband or stolen goods not mentioned in a warrant where two requirements are satisfied: (1) the initial intrusion which enabled the police to view the items was lawful; and (2) the police had probable cause to believe that the items were contraband or stolen goods. *State* v. *Pepe,* [176 Conn. 75, 79, 405 A.2d 51 (1978)]." *State* v. *Hobson,* 8 Conn. App. 13, 18, 511 A.2d 348, cert. denied, 201 Conn. 808, 515 A.2d 379 (1986), cert. denied, 480 U.S. 917, 107 S. Ct. 1370, 94 L. Ed. 2d 686 (1987).[3]

As to the first plain view requirement, the defendant claims that, although the initial intrusion to the basement garage was lawful pursuant to the search warrant, the state failed to prove that the seizing officer had the right to be where he was at the moment he first observed the items.

The defendant asserts that once the defendant, who was the object of the search, was *found,* the search should have ended. The precise rule of law, however, is that once a search warrant has been fully executed and the fruit of the search *secured,* the authority under the warrant expires and further governmental intrusion must cease. *United States* v. *Gagnon,* 635 F.2d 766, 769 (10th Cir. 1980), cert. denied, 451 U.S. 1018, 101 S. Ct. 3008, 69 L. Ed. 2d 390 (1981). The technical difference between the words "found" and "secured"

---

[3] *State* v. *Hobson,* 8 Conn. App. 13, 18 n.7, 511 A.2d 348 (1986), states that it is unclear whether a third requirement, that the police discover the items inadvertently, should be applied. The court continues, however, that in Connecticut, " 'inadvertence is not required if the items seized fall under the category of contraband, stolen property or objects dangerous in themselves.' " Id., quoting *State* v. *Couture,* 194 Conn. 530, 547, 482 A.2d 300, cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1984). In the present case, the court concluded that the museum artifacts were discovered inadvertently. Because the defendant has not challenged that conclusion, on appeal we need not determine whether the trial court's conclusion was clearly erroneous, or whether the trial court even had to make this conclusion.

is immaterial in the present case in light of the trial court's specific finding that the defendant was both found and secured after the plain view discovery. See footnote 4, infra.

We will not disturb factual findings unless they are clearly erroneous. See *State* v. *Zindros,* supra, 238, quoting *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980). In the present case, the trial court made specific findings of fact when it concluded in its memorandum on the defendant's motion for a new trial that the evidence showed that Perry had discovered the items before Simoneau found the defendant.[4] Because the record supports this finding, we conclude that this finding was not clearly erroneous. Accordingly, the state met its burden of showing that the plain view discovery occurred before the defendant was found.

The defendant further contends that the state provided no basis for the trial judge's finding that the seizure took place before the defendant was found. Specifically, the defendant argues that the court "conceded" in its memorandum on the defendant's motion for a new trial that it was possible that Simoneau could have found the defendant before Perry made his discovery. This argument takes the court's statement out of context. The actual statement made by the court was "while it is possible that Simoneau could have found the defendant before Perry made his discovery, *this is highly unlikely* in view of the activities Simoneau was engaged in before finding the defendant in his hiding

---

[4] The trial court stated: "The evidence, however, shows the sequence of events to be as follows: first, the entry by both teams; second, Perry discovered the items in the basement; third, Perry notified Bernes of his find; fourth, Simoneau found defendant in the attic; fifth, defendant was taken into custody and brought down to Bernes on the main floor; sixth, Bernes radioed Perry to terminate the search; and seventh, Perry came upstairs with the seized items."

place." (Emphasis added.) Clearly, the court's determination is that the state had met its burden of showing that the seizure took place before the defendant was found.[5]

As to the second plain view requirement, the defendant claims that the trial court's conclusion that there was probable cause to seize the items was clearly erroneous. When a legal conclusion of the court is challenged, we must determine (1) whether the conclusion is legally and logically correct, and (2) whether the conclusion finds support in the facts set out in the memorandum of decision. *State* v. *Zindros,* supra, quoting *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra.

We first turn to the requirement that the trial court's conclusion that Perry had probable cause to seize the gym bag containing the artifacts must be legally and logically correct. "When the police have prior justification for an intrusion and inadvertently come across items of immediately apparent evidentiary value in plain view they may seize those items. . . . The police meet the 'immediately apparent' requirement if, on discovery, they have probable cause to associate the property in plain view with criminal activity without further investigation. *Arizona* v. *Hicks,* [480 U.S. 321, 324–27, 107 S. Ct. 1149, 94 L. Ed. 2d. 347 (1987)]; *White* v. *State,* 729 S.W.2d 737, 740–41 (Tex. Crim. App. 1987)." (Citations omitted.) *State* v. *Reddick,* supra, 335.

---

[5] In his motion for a new trial, the defendant raised a different claim, namely that the original search was a general search of the premises and not a search for the defendant, and thus was not inadvertent. Presumably, the defendant has put in issue the correctness of the underlying factual findings of the trial court as to the timing of the events that led up to Perry's original search, even though these findings were in response to the legal conclusion that the original search was not inadvertent. Since this particular legal conclusion is not an issue on appeal, we will address only the correctness of the underlying factual findings and not the legal conclusion that the search was not inadvertent.

Numerous definitions have been given to the legal requirements of probable cause. Probable cause to believe that goods are stolen exists when there is enough trustworthy information supporting that proposition that a person of reasonable caution would be justified in believing it. *Texas* v. *Brown,* 460 U.S. 730, 742, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983). Probable cause is not susceptible to precise definition, but depends on the nature of each factual situation. *State* v. *Federici,* 179 Conn. 46, 57, 425 A.2d 916 (1979), citing *Wong Sun* v. *United States,* 371 U.S. 471, 479, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). A practical, nontechnical probability that incriminating evidence is involved is all that is required. *Texas* v. *Brown,* supra. Probabilities are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. *State* v. *Lizotte,* 11 Conn. App. 11, 20, 525 A. 2d 971, cert. denied, 204 Conn. 806, 528 A.2d 1154 (1987). Our cases have made it clear that there is often a fine line between mere suspicion and probable cause, and that line must necessarily be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. *State* v. *Hobson,* supra, 20.

The record reveals that at the time Officer Perry, made his plain view discovery of the artifacts, he had knowledge of the theft at the Slater Museum in Norwich and knew that antique pottery had been stolen. The record also reveals that these artifacts were discovered hidden underneath a tarpaulin in the basement garage of the house, which further indicates that these artifacts were evidence of criminal activity. In addition, Perry's testimony that these artifacts appeared to be valuable antique pottery, coupled with the fact that a label stating "Chinese Han Dynasty"—arguably suggestive of a museum label—was next to these items, and the additional fact that the pottery itself had a dis-

tinctive appearance, reinforces the reasonableness of Perry's belief that the artifacts were stolen from the Slater Museum. Under these circumstances, it was legally and logically correct for the trial court to conclude that Perry had probable cause to seize the open gym bag holding the pottery because it was reasonable to believe that the artifacts were connected to the Slater Museum. Cf. *State* v. *Federici,* supra (plain view seizure of items, including overcoats, lacked probable cause where the police at the time of the seizure knew only that there had been a robbery within the past half hour, within three miles of the car stop, that the suspects were white males, and that they wore outerwear of no specific color, length or distinction).

We next turn to the requirement that the trial court's conclusion find support in the facts set out in the memorandum of decision. The court specifically found that "(1) the items taken were extremely valuable and totally unique, (2) having viewed the items, it must be found that they were distinctive; not the type of things that one would expect to find in a Norwich basement, (3) it is logical that Investigator Perry had knowledge of the crime and that antique pottery was taken, and (4) Perry testified to this effect and that he identified the items observed as fitting the description of articles taken from the museum."

On the basis of our review of the record, we conclude that there was a sufficient factual basis in the record to support the trial court's findings. See *State* v. *Zindros,* supra, quoting *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra. Accordingly, the trial court's probable cause determination was not clearly erroneous.

This court does not agree with the defendant's claim that the court erred in finding that the original seizure was justified under the plain view doctrine. Thus, the

court committed harmless error when it denied the defendant's motion to suppress based on the defendant's lack of standing.

## II

The defendant's second claim is that the trial court erred in admitting Hall's testimony that the value of the items seized was over $81,000. Specifically, the defendant argues that the witness was not competent to testify as an expert on the issue of the value of the stolen museum artifacts, the witness' opinion was taken from inadmissible hearsay, and even assuming that she is an expert, the witness had no independent basis of knowledge to testify on the value of the museum's missing artifacts. We disagree.

" 'The determination of the qualification of an expert is largely a matter for the discretion of the trial court.' " *Siladi* v. *McNamara*, 164 Conn. 510, 513, 325 A.2d 277 (1973); see also *State* v. *Rodgers*, 207 Conn. 646, 651, 542 A.2d 1136 (1988). "The trial court's decision is not to be disturbed on appeal 'unless that discretion has been abused, or the error is clear and involves a misconception of the law.' " *Siladi* v. *McNamara*, supra; see also *State* v. *John*, 210 Conn. 652, 677, 557 A.2d 93, cert. denied,     U.S.     , 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

" 'Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues.' " *State* v. *Rodgers*, supra, 651; 2 B. Holden & J. Daly, Connecticut Evidence (1988) § 118a. "Expertise may come from practical experience or study alone. *Bryan* v. *Branford*, 50 Conn. 246, 248 (1882). In any event, if reasonable qualifications are established, objections go only to the weight to be given

to the witness' opinion rather than to its admissibility." *State* v. *Wallace,* 181 Conn. 237, 241, 435 A.2d 20 (1980).

The record reveals that Hall had been employed as a docent at the Slater Museum for nineteen years. She was familiar with the stolen Netsuke collection and gave weekly lectures about the museum's collections. She had a master's degree in art and had participated in an intensive program in East Asian studies. This witness had sufficient education and personal knowledge about the stolen collection to render a competent opinion as to the value of these missing artifacts despite the fact that she had never previously evaluated collections. See *Oborski* v. *New Haven Gas Co.,* 151 Conn. 274, 280, 197 A.2d 73 (1964). Therefore, the defendant's objection went to the weight to be given the witness' opinion and not to its admissibility. Id. The trial court did not abuse its discretion in qualifying Hall as an expert on the value of the missing museum artifacts.

The trial court also properly permitted Hall to testify from the inventory list and appraisal made by Leavitt. " 'An expert may testify to value, though his knowledge of details is simply derived from inadmissible sources, because he gives the sanction of his general experience.' " *Burn* v. *Metropolitan Lumber Co.,* 94 Conn. 1, 6, 107 A. 609 (1919), quoting *National Bank of Commerce* v. *New Bedford,* 175 Mass. 257, 261, 56 N.E. 288 (1900).

Further, the trial court was correct in finding that Hall derived her information from trustworthy sources and that she based her opinion of the missing Netsuke collection's value not only upon Leavitt's inventory and valuation, but also upon her own experience as an East Asian expert, which was sufficient to enable her to coordinate and evaluate the information in the appraisal

and to make her evidence of probative value.[6] See *Dressel* v. *Gregory,* 114 Conn. 718, 719, 157 A. 417 (1931); *Vigliotti* v. *Campano,* 104 Conn. 464, 466, 133 A. 579 (1926); cf. *State* v. *White,* 37 Conn. Sup. 796, 802, 437 A.2d 145 (1981) (security guard could not testify to value of stolen retail merchandise because her testimony was not based on her personal knowledge or experience, but retail tags were admissible to show value).

## III

The defendant's third claim is that the state did not meet its burden of proving that the value of the stolen artifacts exceeded $10,000. We disagree.

"When an appeal challenges the sufficiency of the evidence to justify a verdict of guilty, we have a twofold task. We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the verdict." *State* v. *Braxton,* 196 Conn. 685, 691, 495 A.2d 273 (1985). "We then determine whether ' "the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." ' " Id.

Applying this test to the specific issue of whether the state proved beyond a reasonable doubt that the value of the artifacts at the time they were taken exceeded

---

[6] This is substantiated in the record:

"Q. Miss Hall, evaluations that you put on this, is this your opinion as to the valuation of these items?

"A. Yes.

"Q. All right.

"A. Derived from Mrs. Killam's appraisal.

"Q. But that's your opinion also  . . . .

"A. Yes.

"Q. As an expert in this field, are these the valuations that you would place on it, if you were placing valuations yourself?

"A. Yes."

$10,000, we conclude that the state met its burden. Our review indicates that the evidence before the jury included Hall's testimony, as well as the inventory and the appraisal of each item, which were admitted as an exhibit.[7] There was thus sufficient evidence concerning the element of value to establish that the defendant was guilty of larceny in the first degree. Accordingly, the trial court properly denied the defendant's motion for judgment of acquittal.

There is no error.

In this opinion the other judges concurred.

---

[7] The defendant claims that the judge gave a limiting instruction that would have prevented the jury from considering the exhibit if Hall's testimony was not competent. Our review of the record indicates that the exhibit was fully admitted and the jury was entitled to give probative weight to this exhibit.